RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0024p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DAVEL CHINN,

    *Petitioner-Appellant,*

  *v.*

WARDEN, CHILLICOTHE CORRECTIONAL INSTITUTION,

    *Respondent-Appellee.*

> No. 20-3982

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Dayton.
No. 3:02-cv-00512—Sarah Daggett Morrison, District Judge.

Argued: October 27, 2021

Decided and Filed: February 4, 2022

Before: SILER, KETHLEDGE, and THAPAR, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Erin Gallagher Barnhart, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Rachel Troutman, Melissa Jackson, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

  SILER, Circuit Judge. Davel Chinn, an Ohio prisoner sentenced to death, appeals the district court's judgment denying his petition for writ of habeas corpus filed under 28 U.S.C. § 2254.

**I.**

On the evening of January 30, 1989, Chinn finished a midterm exam at Cambridge Technical Institute in Dayton, Ohio. Later that evening, fifteen-year-old Marvin Washington was in downtown Dayton, where he claims he saw Chinn, whom he had met a year earlier and only knew by the nickname, "Tony." According to Washington, he and Tony proceeded to drink beer and walk around the downtown area until around 11:00 p.m., when Tony showed him a .22 caliber revolver and suggested they look for someone to rob. Eventually, they happened upon Brian Jones and Gary Welborn, who were parked in a lot and chatting through their driver's side windows. While Washington snuck up to Jones's car, Tony approached Welborn's window and pressed his revolver against Welborn's head. Tony demanded their money, and after he emptied both of their wallets, he and Washington decided to steal their cars. Although Welborn made a quick escape, Washington was able to force Jones into the passenger's seat of Jones's Chevrolet Cavalier. Tony climbed into the back seat and held a gun to Jones's neck, while Washington drove them away.

At some point during the drive, Tony told Washington to pull the car over. Tony and Jones then got out and walked to the rear of the car. At the same time, Stacy Dyer was parked in her driveway when she saw the silhouette of a person exiting a parked Chevrolet Cavalier. Dyer saw two people walk to the rear of the car, at which point she heard a gunshot and a scream. She then saw a person run through her yard and collapse and the car speed away. Washington explained what had happened: once Tony and Jones walked to the rear of the car, Tony shot Jones in the arm, and Washington and he drove away. While they were driving, Tony told Washington that he shot Jones because Jones did not have enough money and could have identified them.

Meanwhile, Dyer ran inside her home to tell her family what had happened. While her sister called the police, Dyer went outside to check on the person collapsed in her yard. Paramedics eventually arrived to find Jones unconscious, and he was pronounced dead upon arrival at the hospital. Later that night, around 12:30 or 1:00 a.m., Washington drove Tony to meet an acquaintance of his in Dayton, named Christopher Ward. Ward recalled that Washington arrived in a black Chevrolet Cavalier and introduced the passenger as "Tony."

Washington and Ward spoke for about half-an-hour before Washington and Tony left. Later that night, Washington met with Ward again, but without Tony, and told him how Tony had shot someone earlier in the evening.

The autopsy report showed that Jones died as a result of a gunshot to his arm, which perforated his main pulmonary artery. The investigation also recovered a .22 caliber bullet near Jones's heart, which a firearms expert determined was fired from a revolver at close range. A few days after the incident, on February 5, police arrested Washington upon information obtained from Ward. Washington confessed and named "Tony" as the killer but could not provide Tony's last name or address. Washington helped police prepare a composite sketch, which a local newspaper printed on February 22.

The next day, Shirley Cox was at her husband's law office, where she worked as a receptionist. Two men walked into the office, and one identified himself as "Tony Chinn." The man named Tony insisted on seeing Cox's husband, but Cox explained that he was unavailable, and the men eventually left. Later that night, while Cox was home reading her newspaper, she gasped to her husband: "My God, I don't believe this." Cox had just seen the composite sketch in the newspaper and recognized the image as the same man who had come to the office earlier. The next day, Cox followed the instructions in the newspaper and called the police.

After speaking with Cox, police obtained a photograph of Chinn and on February 24, presented it to Washington and Ward in a photo array of five other men. Washington identified Chinn as the man who shot Jones, and Ward identified Chinn as the man Washington introduced to him on the night of the murder. Later that day, police arrested Chinn. A few days later, police conducted a lineup for Washington, Ward, Cox, Dyer, and Welborn to identify the suspect. Out of the five, Ward, Cox, and Washington were able to identify Chinn. Washington initially indicated "Tony" was not in the lineup. After leaving the room, however, Washington explained to police that he recognized Chinn but that he was afraid to identify him because he believed that Chinn could see him.

For his part, Chinn presented an alibi. His classmate and instructor testified that Chinn was present for the midterm on the night of the murder, and his classmate testified that Chinn

rode home on a bus with her. Chinn's mother testified that he was at home by 9:30 p.m. and stayed home the entire evening of the murder. Some witnesses also considered the shooter to be taller than Chinn.

In August 1989, an Ohio jury convicted Chinn of aggravated murder, kidnapping, abduction, and three counts of aggravated robbery. The jury recommended the death penalty, and the trial court adopted the recommendation. After multiple appeals, the Ohio Court of Appeals affirmed the sentence, and the Ohio Supreme Court affirmed the sentence and convictions. Chinn filed a state petition for post-conviction relief in 1996, which the trial court dismissed as premature. In 1997, Chinn filed another state petition, and after the trial court denied his claims, the Ohio Court of Appeals affirmed on all but two claims. On remand, the trial court conducted an evidentiary hearing and again dismissed the two claims; this time the Ohio Court of Appeals affirmed. The Ohio Supreme Court denied further review.

In 2002, Chinn filed a § 2254 petition that raised nineteen claims for post-conviction relief. The district court eventually denied Chinn's petition and issued a certificate of appealability (COA) on three claims: (1) whether the prosecution suppressed evidence in violation of *Brady*; (2) whether the trial court improperly admitted irrelevant and prejudicial testimony; and (3) whether Chinn was denied his right to present mitigating evidence to the sentencer on remand and was sentenced to death without a valid recommendation from a jury. Chinn moved to alter or amend the judgment regarding his *Brady* claim, and the court denied the motion on August 18, 2020. Chinn appealed, and moved to expand the COA which we denied on February 11, 2021. Chinn does not address the third issue for which he received a COA, and, therefore, has waived consideration before us. *See Hodges v. Colson*, 727 F.3d 517, 526 (6th Cir. 2013).

**II.**

This habeas petition is governed by 28 U.S.C. § 2254(d) (AEDPA). It instructs that federal courts shall not grant a habeas petition filed by a state prisoner with respect to any claim adjudicated on the merits by a state court, absent applicability of either of two specific exceptions. The first exception is when a state court issues "a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court[.]" 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). The second exception applies when a state court decision "was based on an unreasonable determination of the facts" in light of the record before it. § 2254(d)(2).

"AEDPA's requirements reflect a 'presumption that state courts know and follow the law[,]'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)), and its "highly deferential standard for evaluating state-court rulings . . . demands that state-court decisions be given the benefit of the doubt," *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford*, 537 U.S. at 24). The Supreme Court has repeatedly held it is not enough to show the state court was wrong. *See, e.g.*, *Renico v. Lett*, 559 U.S. 766, 773 (2010) ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." (citation omitted)); *Schiro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable— a substantially higher threshold."). Rather, AEDPA forecloses relief unless the petitioner can show the state court was *so* wrong that the error was "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (per curiam) (citation omitted). Thus, when we review a state court decision under § 2254(d), we must ask whether it is "beyond the realm of possibility that a fairminded jurist could" agree with the state court. *Woods v. Etherton*, 578 U.S. 113, 118 (2016) (per curiam).

"If this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2001). By requiring that federal courts give deference to state courts, AEDPA appreciates "principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (citation omitted). Sensitivity is critical. Federal habeas review of state court convictions is one of our most intrusive exercises of power over our state-court counterparts. *Harrington*, 562 U.S. at 103. It "frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Id.* (citation omitted). Thus, under § 2254(d), federal habeas review is a safeguard against "extreme

malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (cleaned up).

We review the district court's factual findings for clear error and its legal conclusions de novo. *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008). The state court's factual findings enjoy a presumption of correctness and will only be disturbed upon clear and convincing evidence to the contrary. *Id.*

## III.

### A. *Brady* Violation

Chinn's central claim is that the prosecution withheld exculpatory impeachment evidence regarding Washington's identification testimony at trial. This evidence came to light after Chinn's conviction, when an investigator with the Office of the Ohio Public Defender requested Washington's records from the juvenile court. The records included reports that showed Washington suffered from mental disabilities, which raised questions about his ability to accurately identify Chinn as "Tony." After these records were discovered, Chinn brought an ineffective assistance of counsel and *Brady* claim in his state petition for post-conviction relief. The Ohio trial court dismissed the petition, but the Ohio Court of Appeals remanded for an evidentiary hearing to determine whether, considering the withheld records, Chinn's trial counsel was ineffective for failing to call expert witnesses on eyewitness identification and the effects of "mental retardation." The trial court also considered whether withholding these records constituted a *Brady* violation. It dismissed Chinn's petition, and the Court of Appeals affirmed.

Under *Brady v. Maryland*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The Supreme Court has stated that "[t]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The defendant has the burden of proving a *Brady* violation. *Id.*

The only issue before the Ohio Court of Appeals, and therefore before us, is whether prejudice ensued.  Prejudice depends on whether the suppressed evidence is material.  *See id.*  Evidence is "material," if it creates a "reasonable probability of a different result," *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (cleaned up), such that its suppression "undermines confidence in the outcome of the trial," *United States v. Bagley*, 473 U.S. 667, 678 (1985).  We have held that *Strickland*'s "reasonably-likely" prejudice standard is the same as *Brady*'s prejudice standard.  *See Montgomery v. Bobby*, 654 F.3d 668, 679 n.4 (6th Cir. 2011) (en banc).  And in *Harrington*, the Supreme Court explained that the difference between *Strickland*'s "reasonably likely" standard and a "more-probable-than-not standard is slight and matters only in the rarest case."  562 U.S. at 111–12 (cleaned up).  Thus, "reasonable probability" for *Brady*'s purposes is effectively the same as a more-probable-than-not standard.  The *Brady* question now is whether it is more probable than not that the withheld evidence would have created a different result.  The caveat is that there is a "slight" difference between more-probable-than-not and "reasonable probability" and judges can decide for themselves how slight is "slight" enough.  *Id*.  In determining whether a reasonable probability exists, we must consider the undisclosed evidence collectively.  *See England v. Hart*, 970 F.3d 698, 717 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 1691, 209 L. Ed. 2d 467 (2021).  Yet we still evaluate "the tendency and force of the undisclosed evidence item by item."  *Kyles*, 514 U.S. at 436 n.10.

The Supreme Court has also told us that we must examine Chinn's claim through the dual lens of AEDPA and *Brady*.  The two standards work "in tandem."  *Harrington*, 562 U.S. at 105.  So, we do not ask whether the new evidence creates "a reasonable probability of a different result."  *Kyles*, 514 U.S. at 434.  Instead, we ask whether any fairminded judge could agree with the state court's *Brady* assessment.  Furthermore, "so long as the state courts reach a *decision* that reasonably applies Supreme Court precedent—however deficient some of the court's reasoning might be—we must deny the writ."  *Davis v. Carpenter*, 798 F.3d 468, 475 (6th Cir. 2015).

During the state evidentiary hearing, Chinn called Dr. Caroline Everington, Ph.D., to provide an opinion on the import of the newly disclosed records.  Dr. Everington explained that the records showed that Washington had a congenital cranial abnormality, which caused

neuropsychological impairments, and that Washington had moderate range "mental retardation." These records showed that Washington had an IQ of either 54 or 48, which placed him in the lowest one-to-two percent of the population. Furthermore, Dr. Everington noted that the records indicated Washington could become easily distracted and swayed by others, he exhibited some recognition and memory problems, and he had poor vision but refused to wear glasses. In her professional opinion, Dr. Everington believed that Washington had significant deficiencies in his memory at the time of the murder and that his memory would have been questionable. Furthermore, Chinn called Dr. Solomon M. Fulero, Ph.D., J.D., who testified that persons with Washington's disabilities are more likely to exhibit signs of "suggestibility, [a] desire to please authority, or desires to mask or hide mental retardation." Dr. Fulero explained that eyewitnesses who suffer from intellectual disabilities are less likely to identify people accurately.

Despite this evidence, the trial court found the juvenile records were immaterial, and the Ohio Court of Appeals affirmed. Chinn argues the Ohio Court of Appeals unreasonably applied *Brady* and failed to properly consider the exculpatory evidence in conjunction with the defense's evidence at trial. In light of the deferential standards with which we must judge the state court's decision, the Ohio Court of Appeals reasonably applied *Brady*. Other witnesses at the evidentiary hearing controverted Chinn's evidence and, considering the evidence at trial that supported Washington's version of events, the Court of Appeals reasonably concluded there was not a reasonable probability the outcome would have been different had the juvenile records been disclosed.

For example, Lieutenant David Lantz, the chief investigator of the murder, testified at the hearing about how he had interviewed Washington soon after the crime. In Lantz's opinion, Washington understood his questions and gave an internally consistent story. In opposition to Dr. Everington, Lantz believed that Washington's trial testimony was consistent with his original story, and ultimately, nothing about his interactions with Washington led him to believe that Washington had been unable to give a truthful account. Furthermore, Dr. Thomas O. Martin, a clinical psychologist, testified that little can be known by looking solely at a person's IQ scores, and that they do not give information about a person's level of adaptive functioning. For instance, Dr. Martin explained that a person with moderate "mental retardation" would not be

expected to drive a car, write checks, read books, make change with money, or hold down unsupervised jobs. Yet, Washington could drive, had a job, and graduated valedictorian of his high school class. Similarly, although the juvenile records showed that he exhibited some recognition and memory problems, Washington had no trouble identifying people while he was at the juvenile detention facility.

Notably, because Washington was murdered before the evidentiary hearing, Dr. Everington never met him. By contrast, Barbara DeVoss, a social worker at Washington's juvenile facility, had. She testified that, after she read Washington's personal report, her first thought was "I have got a blooming idiot. What can I do but get him directed to a sheltered workshop[?]" But DeVoss explained how she changed her mind after meeting Washington, how she was "very pleasantly surprised" by her interactions with him, and that she "didn't think that [Washington] had as a low an IQ as was stated in the report . . . ."

Likewise, evidence at trial illustrated Washington's ability to remember events. He was able to identify Chinn in the courtroom and describe Chinn's outfit on the night of the murder. Washington remembered with precision details about the night of the murder, like the address of where a bus dropped him off, where he walked, and when he met Chinn. Other witnesses also supported Washington's version of events. For example, not only did Washington remember the color and make of Tony's gun, but he recalled that Tony shot Jones only once in the arm, which Dyer and the autopsy report corroborated. Similarly, Washington's version of the robbery was corroborated by Welborn's story, and Washington accurately remembered the model of car Jones drove—even that it had a digital clock and dome light. Ward's testimony also supported Washington's story. Although Ward never saw who shot Jones, Ward met "Tony" the night of the murder—whom he identified as Chinn—in a car that matched the one Washington and Tony stole from Jones, around the same time the murder occurred. Furthermore, the jury heard testimony that Washington had met Chinn prior to the night of the murder and had spent several hours with the shooter on that evening, both of which are strong indicators of a reliable identification.

Chinn argues that regardless of any disputes at the evidentiary hearing, "material impeaching Washington's credibility was evident from the records without expert testimony."

But the jury had heard impeachment testimony that Washington could not read or write. And although the records indicated Washington may have blacked out, he had already testified that he was drinking the night of the murder. Similarly, Chinn's counsel also had attempted to impeach Washington by questioning him about his failure to initially identify Chinn at the lineup. In the end, while the withheld records would have showed the jury that Washington suffered from a degree of mental disability, the undisclosed evidence would have been cumulative, and hence immaterial. *See Hall v. Mays*, 7 F.4th 433, 447 (6th Cir. 2021).

We acknowledge the serious nature of the state's failure to disclose Washington's juvenile records. But the Supreme Court has admonished habeas courts not to "treat[] the unreasonableness question as a test of its confidence in the result it would reach under *de novo* review" and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102. When assessing whether a state court's application of federal law is unreasonable, "the range of reasonable judgment can depend in part on the nature of the relevant rule that the state court must apply." *Renico*, 559 U.S. at 776 (cleaned up). As such, "the more general the rule at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—the more leeway state courts have in reaching outcomes in case-by-case determinations." *Id.* (cleaned up). Just as in *Strickland*, the *Brady* materiality standard is a general one, and "so the range of reasonable applications is substantial." *Harrington*, 562 U.S. at 105 (citation omitted). Under such a standard, "a state court's decision can't be 'contrary to' federal law for purposes of AEDPA review if the Supreme Court has never issued a holding that confronts the specific question presented by the case." *Cassano v. Shoop*, 10 F.4th 695, 704 (6th Cir. 2021) (Thapar, J., dissenting) (cleaned up). After all, "if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *White v. Woodall*, 572 U.S. 415, 426 (2014) (citation omitted).

As for Supreme Court precedent, Chinn relies on *Wearry v. Cain*, 577 U.S. 385, 388 (2016), in which Wearry was convicted of capital murder and sentenced to death. For Supreme Court precedent to be "clearly established," it must have been decided prior to the state-court decision at issue. *Hill*, 139 S. Ct. at 506–07. *Wearry* was not. But we may consider later

decisions as "illustrative of the proper application" of existing law so long as the later decision does not announce a new rule. *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003). Like Chinn, Wearry was accused of carjacking and killing his victim. *Wearry*, 577 U.S. at 387. Like Washington, the state's key witness, "Scott," had accompanied the defendant during the events leading up to and including the murder. *Id.* Furthermore, during the evening, while they were driving the victim's car, Wearry and Scott stopped to meet another acquaintance, "Brown," who testified at trial about seeing them together in the car—like Ward did here. *Id.* After his conviction, Wearry discovered the state had withheld exculpatory evidence that undermined Scott's story at trial. *See id.* at 389. Chinn likens his case to *Wearry* because in that case the state relied heavily on the credibility of one witness—Scott—weighed against the defendant's alibi. Chinn argues the Court recognized that Scott's credibility had already taken blows at trial—like Washington's—yet did not consider the additional exculpatory evidence immaterial.

But there are key differences between Chinn's case and *Wearry*, and Chinn fails to identify a logical extension of *Wearry*'s holding to his facts. In *Wearry*, the *Brady* evidence included three categories of information. *Id.* at 389–91. First, undisclosed police records showed that while Scott was imprisoned for an unrelated offense, he told another inmate that he wanted to "make sure Wearry gets the needle. . . ." *Id.* at 389 (cleaned up). Furthermore, Scott had orchestrated a meeting between an inmate and the police, for the inmate to make up a story in Scott's favor about witnessing the murder. *Id.* at 389–90. Second, Brown, who testified about seeing Scott and Wearry in the victim's car, had twice sought a deal with the state before testifying to reduce his prison sentence—contrary to the prosecution's consistent assurances to the jury. *See id.* at 390. Third, although Scott had testified that another person ran into the street to stop the victim's car and shoved the victim into the cargo space, undisclosed medical records showed that this person had recently undergone serious knee surgery. *Id.*

Importantly, *Wearry* did not deal with evidence that might have affected the key witness's accuracy—only his veracity. The difference is that despite the juvenile records that call into question the accuracy of Washington's testimony, evidence at Chinn's trial could, and did, support Washington's version of events. And "a reviewing court [must] consider the totality of the evidence—and not merely exculpatory facts in isolation—when evaluating a claim of error

for its prejudicial effect." *Montgomery*, 654 F.3d at 679. Similarly, the exculpatory evidence did not undermine Ward's credibility—as it had Brown's—or render Washington's story about the robbery unlikely—as it had Scott's story about the carjacking. To put a fine point on it: neither *Wearry* nor any case from the Supreme Court controls with sufficient granularity. Under AEDPA, we must ask whether there is any Supreme Court precedent that would compel every fairminded jurist to hold that the State committed a *Brady* error here. As there is none, fairminded jurists could debate whether the "clearly established rule" does or does not apply to the "set of facts" at hand. *White*, 572 U.S. at 427. "If such disagreement is possible, then the petitioner's claim must be denied." *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018) (per curiam).

Chinn also devotes considerable effort to challenging the factual findings of the Ohio Court of Appeals. The Ohio Court of Appeals' factual determinations are presumed correct, unless Chinn can rebut this presumption by clear and convincing evidence. *See* § 2254(e)(1); *Railey*, 540 F.3d at 397. While Chinn challenges different factual conclusions of the state court, his arguments merely reflect disagreements with the inferences reached by that court, rather than showing by clear and convincing evidence that those factual findings were erroneous. As we have made clear, in the absence of clear and convincing evidence, we have no power on federal habeas review to revisit the state court's factual findings. *See, e.g.*, *Matthews v. Ishee*, 486 F.3d 883, 895 (6th Cir. 2007) ("Under AEDPA, we are bound by [the state court's] finding unless [the petitioner] can rebut it with clear and convincing evidence to the contrary."). Chinn's argument is, therefore, without merit.

## B. Prejudicial Testimony

Chinn's second claim is that the Ohio trial court erred by admitting irrelevant and prejudicial testimony at trial concerning Chinn's visit to the law office of Cox's husband. Chinn argues that Cox could have simply testified about speaking with a man named Tony, who resembled the man depicted in Washington's composite sketch, without ever mentioning that her encounter with Chinn occurred in a law office, where Chinn persistently requested to see an attorney. Every reviewing court has thus far agreed, and the Warden does not dispute these

conclusions. Instead, the question is whether the admission of Cox's testimony was harmless error.

In determining whether any state court error was harmless, we may not grant habeas relief unless the state court's error resulted in actual prejudice to the defendant. *Davis v. Ayala*, 576 U.S. 257, 267 (2015); *see also Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *O'Neal v. Balcarcel*, 933 F.3d 618, 624 (6th Cir. 2019). We must be "in grave doubt about whether the trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Reiner v. Woods*, 955 F.3d 549, 555 (6th Cir. 2020) (citation omitted); *see also O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). "[G]rave doubt . . . mean[s] that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal*, 513 U.S. at 435 (cleaned up).

Ultimately, Chinn has not met his burden of showing actual prejudice. *Davis*, 576 U.S. at 267; *Cooper v. Chapman*, 970 F.3d 720, 732 (6th Cir. 2020). Cox's testimony was relevant to establish her identification of Chinn from Washington's composite sketch in the newspaper. While the law firm setting permitted an inference that Chinn was seeking legal help, Cox's testimony did not address the nature of Chinn's inquires nor the field of law practiced by Cox's husband. Furthermore, as Chinn recognizes, the central evidence against him was Washington's testimony and, once the jury believed Washington, a guilty verdict was "inevitable." *See State v. Chinn*, 85 Ohio St.3d 548, 561, 709 N.E.2d 1166, 1178 (1999). In light of the evidence at trial, the Ohio court's error in admitting Cox's testimony did not result in actual prejudice to Chinn.

**PETITION DENIED.**