NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0269n.06

Case No. 25-1370

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| | ) | **FILED**<br>Jun 18, 2026<br>KELLY L. STEPHENS, Clerk |
| KELVIN NOLEN, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| STEVEN FORD, | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | O P I N I O N |

Before: DAVIS, RITZ, and HERMANDORFER, Circuit Judges.

DAVIS, Circuit Judge. Kelvin Nolen served over seven years of a life sentence for first-degree murder and related crimes. He was freed from prison after a postconviction investigation found evidence exculpating him, and the state court vacated his convictions at the request of the prosecutor's office. Following his release, Nolen sued Steven Ford, the detective who investigated the murder, under 42 U.S.C. § 1983 and state law. Nolen claimed constitutional violations based on Ford's use of an allegedly unduly suggestive witness identification procedure, failure to turn over exculpatory evidence, and malicious prosecution. Nolen appeals the district court's decision to dismiss his claims. We affirm.

**I.**

*A. Factual Background*

On November 4, 2014, someone shot and killed Mohamed Zokari while he was working his shift at a Detroit gas station. No one witnessed the murder, and no physical evidence linked any suspect to the crime. However, surveillance footage captured the crime. It showed a man wearing a dark jacket walk into the gas station around 6:00 a.m. and shoot Zokari multiple times. The shooter's face was obscured the whole time.

Detroit Police Sergeant Steven Ford investigated the murder. After several months, the case remained unsolved. In April 2015, Ford spoke to Kenyatta Jones-Hunt, Nolen's estranged sister. Ford told Jones-Hunt that he was investigating a breaking-and-entering incident at her home—a crime she suspected that Nolen had committed. "In truth, Ford was investigating Nolen for the Zokari murder." (Compl., R. 1, PageID 4).

Ford had Jones-Hunt review a surveillance video of the murder and an audio recording from inside the gas station the morning of the shooting. Initially, Jones-Hunt denied that Nolen was the assailant. She suggested that the shooter could be an acquaintance named Darryl Dobbs. But after Ford made several false statements about the evidence, Jones-Hunt identified the shooter as Nolen. For instance, when Jones-Hunt noted that the station's countertop height led her to believe that the shooter was taller than Nolen, Ford said that the counters were "unusually low." (*Id.*). Yet he knew that the counters "were standard size." (*Id.*). Next, he told her that phone records placed Nolen at the gas station at the time of the murder, even though "phone records placed him elsewhere." (*Id.* at PageID 5). And despite "knowing that Nolen had alibi witnesses," Ford said that Nolen was the shooter. (*Id.*). Ford wrote out a statement identifying Nolen as the man in the video. Jones-Hunt signed the statement.

The state of Michigan charged Nolen with first-degree murder and multiple other felonies. Jones-Hunt testified at the probable-cause hearing that based on the shooter's voice, height, and the limited view of his facial features, she could identify the shooter as Nolen. But she was not sure. A magistrate found probable cause to bind over Nolen for trial. But Nolen successfully quashed the charges in the trial court.

The prosecutor promptly reauthorized the charges. In addition to Ford, multiple witnesses testified at a second probable-cause hearing: Orlando Towns, Wasem Saleh, and Jones-Hunt. Towns and Saleh saw a man in a dark jacket at or near the station on the morning of the murder. They did not identify him as Nolen because they never saw the man's face. But Towns testified that he and a friend traveled to the gas station to buy marijuana from Nolen that morning, as he had done three or four times before. After arriving, he heard shots and saw a man running away from the station. Saleh stated that Nolen performed odd jobs around the station, like cleaning, every morning. Saleh did not know of anyone else who did the same. He saw the man in the dark jacket cleaning the station that morning. Jones-Hunt continued to waver. At the second hearing, she testified that she *believed* her brother was the shooter, but she was not positive and could not say for sure if her identification was accurate.

Again Nolen was bound over for trial, and again he moved to quash. While acknowledging that the case was "very circumstantial," the court denied the motion—noting that Jones-Hunt's testimony was "crucial evidence" in finding probable cause to prosecute. (*Id.* at PageID 7). Beyond Jones-Hunt's testimony, the court also credited Saleh and Towns's accounts. And the court found it suspicious that the shooter's face was not captured on video, observing that only someone familiar with the store's layout and camera locations would know how to avoid the surveillance cameras.

A jury trial followed. The prosecution put on multiple witnesses. Consistent with her earlier testimony, Jones-Hunt testified that she believed the man in the video to be her brother, but she was not one hundred percent sure. Defense counsel cross-examined her extensively. Saleh testified that the shooter was six feet tall—six inches taller than Nolen. The jury convicted Nolen of all charges, and he was sentenced to life without parole.

Years later, the Conviction Integrity Unit of the Wayne County Prosecutor's Office and the Michigan Innocence Clinic uncovered exculpatory evidence. First, photogrammetry analysis led experts to conclude that the shooter was three to four inches taller than Nolen. Second, they discovered a previously unidentified eyewitness who confirmed that Nolen was not the perpetrator she saw inside the gas station that morning. These developments prompted the prosecutor to agree to vacate Nolen's convictions. And Nolen was subsequently released from custody.

*B. Procedural Background*

Nolen sued Ford under § 1983 and Michigan law. He brought claims for unduly suggestive witness identification procedures (Count I); *Brady* violations (Count II); fabrication of evidence (Count III); and malicious prosecution under federal and state law (Counts IV and V). Nolen voluntarily dismissed his fabrication-of-evidence claim. Ford moved to dismiss the remaining claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Ford also invoked qualified immunity. In support of his motion, Ford attached select transcripts from the probable-cause hearings and the trial. The district court considered the preliminary-examination and trial transcripts in a limited capacity without converting Ford's motion to dismiss into a motion for summary judgment. *See Wershe v. City of Detroit*, 112 F.4th 357, 372–73 (6th Cir. 2024). The court questioned whether Nolen's due process (unduly suggestive identification procedure) claim

was cognizable but ultimately rested its decision to dismiss on Ford's entitlement to qualified immunity. It granted Ford's motion in full. Nolen appealed.

## II.

We review de novo the district court's decision to dismiss Nolen's claims based on qualified immunity. *Eastep v. City of Nashville*, 156 F.4th 819, 825 (6th Cir. 2025). In doing so, we accept all well-pleaded allegations as true, construe the complaint in the light most favorable to Nolen, and draw all reasonable inferences in his favor. *Id*. at 826. We can affirm the district court's dismissal for any reason that is supported by the record. *See Does v. Whitmer*, 69 F.4th 300, 305 (6th Cir. 2023).

At the motion-to-dismiss stage, courts may consider "exhibits attached to the complaint . . . [or] the motion to dismiss briefing, items in the record, [and] public records without converting the motion to dismiss" into a motion for summary judgment "when these items 'are referred to in the [c]omplaint and are central to the [plaintiff's] claims[.]'" *Wershe*, 112 F.4th at 372–73 (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)); Fed. R. Civ. P. 12(d). We must be cautious, however, not to consider extraneous documents that could introduce disputed factual issues. *See, e.g.*, *Hodges v. City of Grand Rapids*, 139 F.4th 495, 510–12 (6th Cir. 2025) (holding that a court ruling on a motion to dismiss cannot consider police reports that present a one-sided version of events).

## III.

Nolen argues that Ford violated his clearly established right to be free from unduly suggestive identification procedures. He has not demonstrated that the contours of the right in question were clearly established at the time of the alleged violation. So the district court properly dismissed this claim.

Qualified immunity shields government officials performing discretionary functions from suit unless their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  It is a "defense to suit rather than liability." *Hodges*, 139 F.4th at 504.  At the motion-to-dismiss stage, an official is entitled to qualified immunity "when the *complaint* establishes the defense." *Id.* (quoting *Siefert v. Hamilton County*, 951 F.3d 753, 762 (6th Cir. 2020)).  So our inquiry is twofold: Did the "complaint plead[] facts that, when presumed true, give rise to a plausible inference" that the official violated a constitutional right? *Id.*  And do the pleadings plausibly show that the right in question was clearly established at the time of the alleged violation? *Id.*  We accept a right as clearly established when the facts are such that "every reasonable official would have understood that what he is doing violates that right." *Guptill v. City of Chattanooga*, 160 F.4th 768, 776 (6th Cir. 2025) (quoting *Reed v. Campbell County*, 80 F.4th 734, 742 (6th Cir. 2023)).  We can address either question first.  *Id.*  If the answer to either question is no, then Ford is immune from suit. *Chaney-Snell v. Young*, 98 F.4th 699, 708 (6th Cir. 2024).

It is the plaintiff's burden in a § 1983 suit to demonstrate that qualified immunity does not apply. *Rieves v. Town of Smyrna*, 959 F.3d 678, 695 (6th Cir. 2020).  And in demonstrating that the right at issue is clearly established, the plaintiff must define the claimed right "with specificity" rather than with general or broad statements of law.  *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (per curiam); *accord Reichle v. Howards*, 566 U.S. 658, 665 (2012).  That said, a case directly on point is not required. *Salter v. City of Detroit*, 133 F.4th 527, 540 (6th Cir. 2025).  But plaintiffs must point us to analogous precedent that places the existence of the right in question "beyond debate." *Id.* (citation omitted).

Nolen claims that the identification procedures Ford used with Jones-Hunt were unduly suggestive and violated the Fourteenth Amendment's Due Process Clause. Specifically, he contends that Ford's actions in showing Jones-Hunt electronic media depicting only one person was "akin to a single-person show-up" and that when combined with the false statements Ford made to Jones-Hunt, they provide plausible grounds for relief. (Appellant's Br., ECF 17, 20). He directs our attention to *Gregory v. City of Louisville* for the unchallenged proposition that "[c]riminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." 444 F.3d 725, 746 (6th Cir. 2006) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)). Yet, Nolen cites no binding precedent sufficiently analogous to this case to establish that Ford's identification procedures were unconstitutional. After all, "clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (citation omitted).

To be sure, in *Stovall*, the Supreme Court determined that due process encompasses protection from the threat of "irreparable mistaken identification" posed by eyewitness identifications stemming from "unnecessarily suggestive" identification procedures. 388 U.S. at 301–02. The "driving force" behind *Stovall* and its progeny, however, is the commonsense concern that *eyewitness* identifications are often unreliable. *Manson v. Brathwaite*, 432 U.S. 98, 111–12, 114 (1977). For it has been established that "the construction of memory is greatly influenced by post-experience suggestion." *United States v. Russell*, 532 F.2d 1063, 1066 (6th Cir. 1976); *see also United States v. Smithers*, 212 F.3d 306, 311–12 & n.1 (6th Cir. 2000). So if a police officer uses unnecessarily suggestive tactics to coax an eyewitness into identifying a suspect, "[t]he due process check" may "come[] into play." *Perry v. New Hampshire*, 565 U.S.

228, 241 (2012). As a result, *Stovall* first recognized "a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." *Gregory*, 444 F.3d at 746 (quoting *Stovall*, 388 U.S. at 302). But the circumstances we have recognized as giving rise to a claim of an unduly suggestive identification procedure are sparse. And Nolen's situation resembles none of them.

Take *Gregory*. In that case, we affirmed the denial of qualified immunity to an officer who "used an unduly suggestive show-up procedure." *Id.* at 745. Citing *Stovall*, Gregory claimed that the officer violated "a known constitutional right." *Id.* The defendant officer argued that he was entitled to qualified immunity because there was no per se rule *against* show-ups. *Id.* at 746. But reasonable officers, we held, would still know from binding precedent that they "must evaluate the totality of the circumstances and reach a reasoned conclusion as to whether an identification procedure is impermissibly suggestive" before "deci[ding] to undertake a show-up." *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)). Whether the officer did so under the facts of that case was a question for the jury to decide. So qualified immunity did not apply. Similarly, in *Webb v. Havener*, we held that a show-up procedure used on eyewitnesses was unduly suggestive. 549 F.2d 1081, 1086–87 (6th Cir. 1977). Police presented eyewitnesses, one-on-one, with Webb—whose physical features poorly matched the "general description[s]" given by the eyewitnesses. *Id.* at 1083, 1086. The officers offered "[n]o explanation" for arranging a show-up rather than a lineup, and "no necessitous circumstance . . . justified a hurried confrontation." *Id.* at 1086. The show-up was unduly suggestive in that the officers "ask[ed] the witnesses to wait at the station while the officers left to bring in another suspect, [thus] unavoidably suggest[ing] to the witnesses

that Webb, the man with whom the officers returned, was the man whom they should identify."
*Id.*

More recently, in *Ramsey v. Rivard*, we denied qualified immunity to an officer who orchestrated one-on-one show-ups of two men whose physical features and license plate number did not match eyewitness descriptions. 110 F.4th 860, 863–64 (6th Cir. 2024). We came to the same conclusion in *Salter*, where the defendant officer showed an eyewitness a single black-and-white mug shot of Salter, falsely indicated that he had independent grounds to suspect Salter, and told the eyewitness that Salter was the person involved in the subject shooting, even though Salter did not fit the description the officer had received. 133 F.4th at 541. Likening Salter's single-photo identification to the single-person show-up in *Webb*, we concluded that it was clearly established that the identification procedures employed in that case were unconstitutional. *Id.* at 540–41.

Nolen's circumstances are unlike those in which this court or the Supreme Court has determined that due process protections attach. Although Nolen compares Ford's actions to the single-person show-ups in *Gregory*, *Webb*, and *Ramsey*, those cases meaningfully differ from this case. First, Jones-Hunt was not an eyewitness who previously only had occasion to make "a single brief observation" under circumstances of emergency or emotional stress. *Russell*, 532 F.2d at 1066. Second, despite Jones-Hunt's estrangement from Nolen, her longstanding familiarity with her brother would seemingly undercut the suggestibility concerns that underlie the unreliability issues identified in *Manson*.[1] And even if *Ramsey* or *Salter* were sufficiently analogous—they are

---

[1] In noting the familial relationship between the witness and Nolen here, we do not mean to foreclose the possibility of unduly suggestive procedures involving family members under different circumstances.

not—they were not decided until well after Ford's actions in this case. So, they could not have placed Ford on notice for any actions he took in 2015.

Resisting this end, Nolen suggests that *United States v. Beverly*, 369 F.3d 516 (6th Cir. 2004), clearly establishes the law as it relates to identifications made by non-eyewitnesses. *Beverly* is inapt. To start, it was a criminal case, not a § 1983 case, so the court did not face a question of qualified immunity. More importantly, it did not find that the identification procedure used there was unduly suggestive. In *Beverly*, a wife who—like Jones-Hunt—was not an eyewitness to the crime at issue identified her then-husband from a surveillance photo the investigating officer showed her. *Id.* at 537–39. Her husband—the defendant in the case—sought to suppress the identification as unduly suggestive. But the district court denied the defendant's motion to suppress the identification, reasoning that it was not obtained in an unduly suggestive manner and was "not likely to have produced a misidentification" given the wife's familiarity with the suspect. *Id.* at 539. And we affirmed.

The broader point Nolen attempts to pull from *Beverly*—that non-eyewitness identifications are subject to the same due-process protections based on suggestiveness as eyewitness identifications—takes a creative lens to its holding. Moreover, it misses the forest for the trees. In *Beverly*, neither this court nor the district court found any infirmity in the officer's showing the defendant's ex-wife his surveillance photo. So that case provides no roadmap for liability and does not clearly establish the right Nolen seeks to vindicate.

As such, Nolen has not overcome Ford's assertion of qualified immunity on this claim.

**IV.**

Next, Nolen claims that the district court improperly dismissed his Fifth Amendment claim under *Brady v. Maryland*, 373 U.S. 83 (1963). For support, he points to his allegations that Ford failed to disclose that Jones-Hunt first indicated that Darryl Dobbs could be the person captured in the surveillance video. We agree with the district court, however, that Nolen has not shown a plausible likelihood that the nondisclosure of Jones-Hunt's initial suggestion of Dobbs prejudiced his defense. So his claim cannot survive.

A *Brady* claim has three elements. The evidence at issue must be "favorable" either because it is "exculpatory or impeaching"; the evidence must have been suppressed; and "the suppression [must have] resulted in prejudice" to the criminal defendant. *Hill v. Mitchell*, 842 F.3d 910, 926 (6th Cir. 2016). Neither side disputes that Nolen has pleaded facts sufficient to satisfy the first two elements. So our review centers on the third element, often called "the materiality requirement." *McNeill v. Bagley*, 10 F.4th 588, 598 (6th Cir. 2021) (citation modified). Evidence is material if "it is more probable than not that the withheld evidence would have created a different result." *Chinn v. Warden, Chillicothe Corr. Inst.*, 24 F.4th 1096, 1103 (6th Cir. 2022). Contextualizing the evidence within the record as a whole, we ask whether the prosecution's "failure to disclose the evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Hughbanks v. Hudson*, 2 F.4th 527, 542 (6th Cir. 2021) (citation modified).

Relevant here, undisclosed impeachment evidence is not material if it merely would have provided an "additional basis . . . to challenge a witness whose credibility has already been shown to be questionable." *Jefferson v. United States*, 730 F.3d 537, 550 (6th Cir. 2013) (citation omitted). As an example, consider a waffling witness who "already testified to making several

contradictory statements" on a relevant issue. *Doan v. Carter*, 548 F.3d 449, 461 (6th Cir. 2008). The likelihood that more impeachment evidence would have changed a jury's assessment of that witness's credibility is slim. *Id.*

Even when undisclosed impeachment evidence would undermine the strongest evidence supporting a conviction, materiality is not assured. For instance, in *McNeill*, we found such evidence immaterial for *Brady* purposes when (1) it would have been used only to impeach the prosecution's "star" witness, (2) ample other evidence supported the conviction, and (3) corroborating evidence "undermined any impeachment value" of the undisclosed evidence. 10 F.4th at 601–04 (citation modified). Furthering the point, the Supreme Court recently observed that "even if undisclosed evidence entirely discredits a prosecution witness, the failure to turn over the evidence is not material if considerable other evidence links the defendant to the crime and the record provides strong support that the defendant would have been convicted anyway." *Klein v. Martin*, 607 U.S. 213, 222 (2026) (per curiam) (citation modified).

At this stage of litigation, we have only Nolen's complaint allegations and the exhibits attached to Ford's motion-to-dismiss briefing—including the trial and probable-cause hearing transcripts—to consider the question of prejudice. We may properly consider these items because they "are referred to in the complaint and are central to [Nolen's] claims." *Wershe*, 112 F.4th at 372–73 (citation modified). The complaint quotes directly from the probable-cause hearing transcripts, describes Jones-Hunt's "preliminary examination and trial testimony," refers to Saleh's trial testimony, and attributes Nolen's convictions in part to "Jones-Hunt's identification of her brother" at trial. (Compl., R. 1, PageID 5–7, 9, 15). Moreover, the transcripts present an authoritative version of events that neither party disputes. Put differently, they clarify, rather than distort, the factual allegations in the complaint. *Cf. Hodges*, 139 F.4th at 511. Therefore, we

consider these items consistent with our obligation to draw all reasonable inferences in Nolen's favor.

To plausibly establish that the Dobbs identification ("i.d.") was material, Nolen needed to supply facts sufficient to show that disclosing Jones-Hunt's Dobbs i.d. would change the complexion of the case enough to undermine confidence in the verdict. *See Hughbanks*, 2 F.4th at 542. Yet Nolen's complaint does little to no work on this front. As regards the Dobbs i.d., the complaint simply alleges that Ford omitted this evidence and later declares that "there is a reasonable probability" that Nolen would not have been charged if the Dobbs i.d. were disclosed. (Compl., R. 1, PageID 4, 13). But merely identifying the withheld evidence is not enough. *See Hughbanks*, 2 F.4th at 541 (rejecting the "conclusory assertion that trial counsel, armed with the remaining suppressed favorable evidence, could have constructed a plausible alternative narrative of the crime and raised reasonable doubt in the minds of the jurors" (citation modified)). To show prejudice, a plaintiff must explain *how* the undisclosed evidence calls the verdict into question. Baldly asserting that the disclosure of Dobbs i.d. would have led to a different result, while neglecting to frame this evidence in the context of the other proofs presented, is "precisely the kind[] of conclusory allegation[] that *Iqbal* and *Twombly* condemned." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013). For this reason, we see no reason to disturb the district court's decision.

Perhaps attempting to fill in the gaps of his factual allegations with argument, Nolen contends that the Dobbs i.d. was uniquely probative, since "no other physical or forensic evidence link[ed] [him] to the crime." (Appellant's Br., ECF 17, 30). But this argument acknowledges that the central usefulness of the Dobbs i.d. was its potential impeachment value. And that fact may be its weakness for materiality purposes. Just as in *Jefferson*, the evidence would have been used

to impeach a witness whose credibility was *already* questionable. 730 F.3d at 550, 552. And like *Doan*, the jury had reason to question Jones-Hunt's credibility: She readily admitted that she was not confident in her identification. 548 F.3d at 461. So the fact that she initially thought the video could have depicted someone else can be considered cumulative. Moreover, even assuming that Jones-Hunt was the prosecution's star witness, *see McNeill*, 10 F.4th at 602, and the disclosure of the Dobbs statement would have "entirely discredit[ed]" her testimony, *Klein*, 607 U.S. at 222 (citation omitted), the strength of the case against Nolen, while not overwhelming, was sufficient to overcome this infirmity.

We reach the same conclusion when viewing the undisclosed evidence in the context of the record available to us. *See Hughbanks*, 2 F.4th at 540. First, as the district court noted, Jones-Hunt did not witness the crime, and her entire testimony was "equivocal"—not just "the Darryl Dobbs statement." (Op. and Order, R. 25, PageID 572). Second, the defense had ample opportunity to attack Jones-Hunt's testimony because Nolen knew about her wavering identification before trial began. And although she was the one to identify Nolen, she was just one of multiple witnesses whose testimony "link[ed] [Nolen] to the crime." *Klein*, 607 U.S. at 222 (citation omitted). For example, Saleh worked at the gas station and pinpointed Nolen as the only person he knew to do early-morning odd jobs around the station as the man in the video did. And Towns showed up, expecting to make a purchase from Nolen the morning of the shooting as he had done in the past.[2] Moreover, the surveillance footage showed that the man in dark clothes appeared to hide his face from the camera. A factfinder validly could infer that Nolen was the man in the surveillance video from this evidence. Thus, whether or not the jury accepted Jones-Hunt's

---

[2] Although the record before us does not indicate whether Towns testified at trial, Nolen's assertion that he would not have been charged had the Dobbs i.d. been disclosed implicates Towns's preliminary hearing testimony, which is part of the record on appeal.

identification, the sum total of the evidence presented allowed the jury to render a verdict deserving of confidence at the time it was rendered.

We affirm the district court's dismissal of Nolen's *Brady* claim.

**V.**

Finally, Nolen makes claims for both federal and state malicious prosecution based on Ford allegedly misrepresenting, falsifying, and/or omitting information that informed the state court's probable-cause determination. The district court found that Nolen's claims were not viable because, despite Ford's alleged conduct, there was probable cause to prosecute Nolen. On appeal, Ford again invokes qualified immunity and contends that the district court properly evaluated probable cause, especially given Nolen's alleged failure to identify any particular false statements by Ford that undercut the state court's preliminary-examination finding. We largely agree and affirm.

The "gravamen" of a malicious prosecution claim is the "wrongful initiation of charges without probable cause." *Thompson v. Clark*, 596 U.S. 36, 43 (2022). To make out such a claim, Nolen must show that (1) Ford influenced or participated in the decision to initiate the prosecution; (2) Ford lacked probable cause; (3) Nolen suffered a liberty deprivation as a result; and (4) the criminal case was resolved in his favor. *France v. Lucas*, 836 F.3d 612, 625 (6th Cir. 2016). Michigan's cause of action is nearly identical, except it also imposes a "malice" element. *Susselman v. Washtenaw Cnty. Sheriff's Off.*, 109 F.4th 864, 872 (6th Cir. 2024). Although Nolen argues that he has met all the elements for federal and state malicious prosecution, both claims fail on the lack-of-probable-cause requirement. So we cabin our analysis to that element.

There is no specific formula to judge probable cause. *See United States v. Kinison*, 710 F.3d 678, 682 (6th Cir. 2013). Probable cause to initiate a criminal prosecution exists when

available information "establish[es] a probability or substantial chance that the suspect committed the charged crimes." *Howell v. McCormick*, 148 F.4th 834, 853 (6th Cir. 2025) (citation modified). And police statements are often critical components informing the basis of probable cause. Where there has been a judicial determination of probable cause, showing a lack of probable cause based on an officer's false statements or omissions requires a plaintiff to make a substantial showing that the officer "knowingly or recklessly" misrepresented, omitted, or falsified information that was "'material, or necessary, to the finding of probable cause.'" *Novak v. City of Parma*, 33 F.4th 296, 306 (6th Cir. 2022) (quoting *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010)). We have imposed a higher bar on omissions, requiring plaintiffs to show that the officer "omitted information with the intent to mislead and that those omissions were critical to the finding of probable cause." *United States v. Richards*, 164 F.4th 508, 519 (6th Cir. 2026) (citation modified).

As an initial matter, the false statements Nolen alleges in his complaint are statements Ford made to a witness—not statements he made to the prosecutor or the preliminary-hearing court. And although Nolen cites cases suggesting that such a factual scenario can plausibly show an officer's involvement in a prosecution, *see, e.g.*, *Sykes*, 625 F.3d at 316 (recognizing that a police officer's "influence" over "the decision to prosecute" can be "based on . . . [exerting] pressure or influence . . . over an individual who . . . testified at the preliminary hearing" (citation modified)), he directs our attention to no case in which we have relied on such statements to satisfy the no-probable-cause requirement, *cf. Gregory*, 444 F.3d at 758 (making "material misrepresentations to the court"); *Sykes*, 625 F.3d at 312 (giving false testimony at a preliminary examination); *King v. Harwood*, 852 F.3d 568, 583 (6th Cir. 2017) (making false statements in a report or affidavit). We, therefore, do not fault the district court for making the accurate observation that Ford's actions

in influencing a witness (Jones-Hunt) support the first element of a malicious prosecution claim—not the second. (*See* Op. and Order, R. 25, PageID 24).

The same is not true for the alleged omissions. Unlike the false-statement allegations, Nolen does tie Ford's alleged omissions to the information Ford gave to prosecutors and the court. So they warrant greater scrutiny. And contrary to Ford's contention, we do not deem Nolen's argument on this point forfeited.[3]

To consider whether and how Ford's alleged conduct may have affected the probable-cause determination, we "include the information omitted" and "set aside [any allegedly false or misleading] statements." *Sykes*, 625 F.3d at 305; *see also Mills v. Barnard*, 869 F.3d 473, 480–83 (6th Cir. 2017) (considering whether probable cause would have existed had exculpatory evidence been properly disclosed); *Gregory*, 444 F.3d at 759 (concluding that "without [misleading police] testimony or with . . . [omitted] exculpatory information . . . the preliminary hearing judge would have failed to find probable cause").

Probable cause was a close call in this case. Indeed, Nolen successfully quashed the initial charges against him when the trial court determined that the magistrate erred in finding probable cause. Following the prosecutor's reauthorization of charges, however, the court found probable cause at a second preliminary hearing and bound over Nolen for trial. The court based its probable-cause determination on an array of evidence. For instance, the court noted Saleh's testimony that only Nolen regularly cleaned the store inside of the gas station during the relevant time frame. And surveillance video depicted the culprit cleaning the store in the way Saleh described. Further,

---

[3] Although Nolen's briefing in the district court was not a model of clarity, we read his argument—that the complaint sets forth sufficient facts to present to the factfinder in the instant case previously undisclosed information about Ford's questioning tactics—in conjunction with his complaint allegations. Through that lens, he adequately preserved the issue for appeal.

the court viewed the shooter's conduct in obscuring his face from the camera as something only someone familiar with the store would know how to effectively accomplish. Moreover, Towns testified that he and a friend were at the gas station the morning of the shooting to meet Nolen. Towns expected Nolen to be there because Towns usually went there after leaving work specifically to buy marijuana from Nolen.

Although Nolen's complaint generically references the preliminary-hearing evidence on which the state court relied for its probable-cause finding, the complaint discusses none of the preliminary-hearing evidence cited above. Instead, Nolen asserts that the court considered Jones-Hunt's equivocal testimony identifying him as the shooter to be a "crucial" piece in this "very circumstantial" puzzle. (Compl., R. 1, PageID 7). He argues that his allegations concerning the court's reliance on that testimony were sufficient to show a lack of probable cause given Ford's omissions relating to the circumstances of Jones-Hunt's identification of Nolen. On this latter point, says Nolen, Ford omitted the Dobbs i.d. from his report (shared with prosecutors) and his testimony before the court. (Appellant's Br., ECF 17, 34–36). And he failed to advise the court that he had "corrupted" Jones-Hunt's identification of her brother by providing her "false information" about the countertops, saying that "phone records 'placed [Nolen] at the gas station' at the time of the murder," and telling her "that Nolen was the murderer, despite knowing that Nolen had alibi witnesses and was in a different location" when the crime occurred.[4] (*Id.*); (Compl., R. 1, PageID 4–5).

---

[4] Material omissions typically pertain to the officer's actions and perceptions. A paradigmatic example is when an officer omits pertinent factual information. *Sykes*, 625 F.3d at 306–07 (finding an omission to be material where an officer omitted from a warrant affidavit the fact that surveillance footage showed two armed men at a robbery scene). Some of the omissions that Nolen alleges appear to be one degree removed from an ordinary case. For instance, he counts as an omission Ford's failure to disclose his questioning tactics. But he points to no caselaw clearly establishing that an officer is liable for malicious prosecution under § 1983 for neglecting to disclose such information. Because we conclude that the remaining evidence supported probable cause, we need not further consider the materiality of these omissions.

According to Nolen, if we add in these alleged omissions and accept the complaint's allegations as true, then we must conclude that there was no probable cause here. *See Sykes*, 625 F.3d at 305. But viewed in the light most favorable to Nolen, his allegations could, at most, weaken only one item of evidence: Jones-Hunt's identification. Even acknowledging the cruciality of that evidence, however, we still must consider whether other evidence presented to the court established probable cause. This is where Nolen's claim falters. Considered together, the remaining evidence—however circumstantial—was sufficient to establish "a probability or substantial chance" that Nolen was the culprit. *Howell*, 148 F.4th at 853 (citation omitted). As we previously have observed, "probable cause determinations focus on probabilities, not certainties." *United States v. Saine*, 162 F.4th 804, 808 (6th Cir. 2025).

As such, even if the court knew of Jones-Hunt's initial suggestion that Dobbs could be the shooter, that revelation would not have "collapsed the foundations" of the court's probable-cause determination. *Mills*, 869 F.3d at 481. Jones-Hunt still would have concluded—albeit equivocally—that she thought the shooter was her brother. And even if the court believed Jones-Hunt's identification was substantially weakened by this information, other preliminary-hearing witnesses' testimony still would have linked Nolen to the crime, leaving the judge's inference about the video and Towns and Saleh's testimony intact.

Thus, we conclude that the complaint lacks factual allegations sufficient to demonstrate that Ford's alleged omissions—even viewed in the light most favorable to Nolen—show there was no probable cause to charge Nolen.

**VI.**

For the foregoing reasons, we affirm.